

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | P. Michael Mahoney | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 50136 | **DATE** | 2/27/2004 |
| **CASE TITLE** | | Rivas vs. Barnhart | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached Memorandum Opinion and Order, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Defendant's Motion for Summary Judgment is granted. Plaintiff's Motion for Summary Judgment on the administrative record and pleadings is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| No notices required, advised in open court. | | | Document Number |
|---|---|---|---|
| No notices required. | | number of notices | |
| ✓ Notices mailed by judge's staff. | | FEB 27 2004 | 21 |
| Notified counsel by telephone. | | date docketed | |
| Docketing to mail notices. | | | |
| Mail AO 450 form. | | docketing deputy initials | |
| Copy to judge/magistrate judge. | | 2/23/2004 | |
| | | date mailed notice | |
| sp | courtroom deputy's initials | | |
| | | Date/time received in central Clerk's Office | sp  mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| EDWARD RIVAS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 03 C 50136 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | P. Michael Mahoney |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Edward Rivas ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits ("DIB") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. §1381(a). This matter is before the Magistrate Judge pursuant to consents filed by both parties on June 13, 2003. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I.    BACKGROUND

Plaintiff filed for DIB on August 22, 2001, alleging disability on April 26, 2001. (Tr. 117). Plaintiff's application for benefits was denied on January 3, 2002. (Tr. 82). On February 19, 2002, Plaintiff filed a request for reconsideration. (Tr. 86). Plaintiff's request for reconsideration was denied on April 29, 2002. (Tr. 88). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on May 15, 2002. (Tr. 92). Plaintiff appeared, with counsel, before an ALJ on October 29, 2002. (Tr. 25). In a decision dated December 26, 2002, the ALJ found that Plaintiff was not entitled to DIB. (Tr. 24). On January 8, 2003, Plaintiff requested a

review of the ALJ's decision by the Appeals Council. (Tr. 7). On March 10, 2003, the Appeals Council denied Plaintiff's request for review. (Tr. 5).

## II. FACTS

Plaintiff was born on December 10, 1967 and was thirty-four years old at the time of his October 29, 2002 hearing. (Tr. 31). Plaintiff graduated from high school. (*Id.*). At the time of his hearing, Plaintiff had been living with his mother for two years since separating from his wife. (*Id*). Plaintiff suffers from affective/mood disorders and a disorder of his back. It is for these reasons that Plaintiff claims to be disabled.

As an initial matter, Plaintiff testified that he had back surgery in 1998. The date of the surgery was not disclosed. From 1998 to 2000, Plaintiff worked for Hilton performing general cleaning duties. (Tr. 37). Specifically, Plaintiff testified he cleaned windows, restrooms and wiped down the machines. (*Id.*). The job required no lifting but did require Plaintiff to be on his feet for eight hours. (Tr. 38). Plaintiff testified that he took a three month leave of absence from his job at Hilton after his back surgery, but returned after the three months.

After Hilton, Plaintiff worked for Capsa Corporation, which later became First Staffing. Although unclear, Capsa, and then First Staffing, appear to be temporary employment agencies. While at First Staffing, Plaintiff worked on an assembly line and as a welder. The assembly line job required no lifting but required Plaintiff to stand for ten hours with a few sit down breaks and lunch. (Tr. 55). Plaintiff testified that he was having problems with his job and informed his supervisor because he was having pain in his back associated with standing for such a long duration. (Tr. 36).

As a welder, which Plaintiff apparently did at some point, Plaintiff testified that he had to lift approximately fifteen to twenty pounds (the weight of the grinder). (Tr. 34). Plaintiff apparently

attempted to find work as a grinder in May/June 2001 but was unable to attain such employment because he did not have the strength to lift the fifteen to twenty pound grinder. (*Id.*).

In terms of Plaintiff's day-to-day activities, Plaintiff testified that since he stopped working in April, he does little around the house except watch television. (Tr. 38). Plaintiff stated he spends an average of four to five hours watching television and can sit and watch television for about a half an hour without having to stand.[1] (*Id.*). On occasion, however, Plaintiff testified that he helps with the dishes[2] and sweeps. Except on holidays, Plaintiff also stated that he does not leave the house to visit friends or relatives and usually only drives his car when he has to go to the doctor. (*Id.*). Generally, Plaintiff gets only one or two hours of sleep a night because of the pain. (Tr. 54).

Since his back surgery in 1998, Plaintiff testified he feels "[p]ain, a lot of pain" in his back. (Tr. 40). Generally, the pain is located in his lower back down through his right leg. (*Id.*). Occasionally, Plaintiff stated, the pain goes down to his right toe, but always goes to his right leg. (*Id.*). Plaintiff described the pain as a "stabbing pain" that has worsened since April 2001 when he was "walking around the house and ... happened to start coughing and sneezed." (Tr. 33). Since that day in April 2001, Plaintiff stated he feels the pain everyday. (Tr. 40). As a result of the pain, Plaintiff stated he can only sit or stand for about fifteen minutes and he can only walk half a block before his leg starts to weaken from the pain and he falls. (Tr. 42). When asked to clarify, Plaintiff stated that on seven or eight occasions while walking he felt as though he could not control his right leg and he loses control of it and falls. (*Id.*). Plaintiff stated his doctors told him he falls because

---

[1] Later in his testimony, Plaintiff clarified this by testifying that he generally watches television while laying down on the floor. (Tr. 42).

[2] Plaintiff later testified that it takes him less than ten minutes to wash the dishes and he uses a chair to put his knee on to take pressure off his lower back. (Tr. 41).

he has nerve damage in his leg. (Tr. 43). On his own and without being prescribed one, Plaintiff started using a cane. (Tr. 57).

In addition to his leg and back pain, Plaintiff testified that he suffers from depression. (Tr. 45). Plaintiff testified that for about six or eight months prior to the hearing he was feeling depressed, usually about his leg, back and the pain that goes with both. (*Id*.). Like the pain in his back and leg, Plaintiff stated he feels depressed everyday for a few hours at a time. (*Id*.). During those few hours, Plaintiff locks himself in a room and cries. (Tr. 48). Additionally, Plaintiff testified that he blacked out twice over the course of six months prior to the hearing as a result of his depression. (*Id*.). Plaintiff was unable to identify anything specific that caused the blackouts. (Tr. 47). In addition to the occasional blackouts, Plaintiff testified he vomits and has diarrhea everyday. (Tr. 50).

Vocational Expert, Susan Entenberg, appeared before the ALJ during Plaintiff's October 2002 hearing. (Tr. 65). Ms. Entenberg first testified that Plaintiff's job at Hilton would be light unskilled and Plaintiff's welding job would be light semi-skilled but also performed at a heavy level. (Tr. 66). The ALJ then asked Ms. Entenberg to assume the following:

> With the ability to read, write and numbers and the same prior work history as the [Plaintiff] in this case with the capacity to perform work with the following and no other additional limitations. Lifting and carrying be limited to up to 20 pounds maximum on occasional basis and 10 pounds frequently with the ability to sit, stand and walk respectively with normal breaks up to six hours each within an eight hour day. The individual could not climb ladders, ropes or scaffolds, but may otherwise climb ramps or stairs, balance, stoop, kneel, crouch or crawl with no more than an occasional basis. The individual must avoid exposure to hazards, such as exposed, unprotected heights or excavations or dangerous machinery and would not have the capacity to recall or focus upon or carry out complex or detailed instructions or to focus upon or perform complex or detailed work activities at a

sustained pace. But retain the capacity to focus on and carry out simple instructions and to perform simple, routine tasks at a sustained workmanlike pace. Additionally the individual should not perform work which would require more than incidental contact with members of the general public.

(Tr. 68). Based on the above, Ms. Entenberg stated that such an individual could only perform the housekeeping work. (*Id.*). The ALJ next asked Ms. Entenberg to further assume that the individual was "limited in terms of lifting and carrying up to a 10 pound maximum on occasional basis and five pounds frequently the individual could stand and walk for no more than a combined total of two hours in an eight hour day and for no longer than about 15 minutes continuously." (Tr. 69). Based on the further limitation, Ms. Entenberg stated that all prior work would be eliminated. (*Id.*). However, Ms. Entenberg testified that such an individual would nonetheless be able to perform some assembly jobs, some packer jobs and some inspection jobs in the region.[3] (*Id.*). Specifically, Ms. Entenberg testified that there are about 7,000 assembly jobs in the region, about 4,000 packer jobs in the region, and about 3,000 inspection jobs in the region that such an individual could perform. (Tr. 70).

In regards to the three above mentioned jobs, the ALJ then asked whether the use of a cane for ambulation, and not for standing, would eliminate any of the above mentioned jobs. (*Id.*). Ms. Entenberg stated that no jobs would be eliminated. (*Id.*). Finally, with regards to the three above mentioned jobs, the ALJ asked Ms. Entenberg what is the minimum duration that an individual must be able to sit. Ms. Entenberg stated that an individual must be able to sit continuously for thirty to 45 minutes. (*Id.*). Even if the individual had to take breaks for a minute or two after 30 to 45

---

[3] The region, in terms of statistical analysis, encompasses the City of Chicago and the surrounding nine counties. (Tr. 69).

minutes, Ms. Entenberg testified that such action would not eliminate any jobs. (Tr. 71).

III. **MEDICAL HISTORY**

The earliest medical report before this court is dated July 19, 1999. On that date, Plaintiff

saw Dr. Noam Stadlan of the Chicago Institute of Neurosurgery and Neurosresearch. (Tr. 242). By

way of background, Dr. Stadlan reported that Plaintiff had a lumbar discectomy in October 1998

because he was having back pain, right leg pain, and numbness. (*Id.*). Dr. Stadlan also reported that

subsequent to his October 1998 surgery, Plaintiff's leg pain had resolved but Plaintiff was still

having residual numbness and significant back pain. (*Id.*). A physical examination of Plaintiff

revealed a healthy appearing gentlemen with some localized pain on flexion and extension. (Tr.

241). A neurological examination showed some slightly decreased strength in Plaintiff's right L5

distribution. (*Id.*). Dr. Stadlan recommended Plaintiff have an MRI scan and flexion/extension films

of his back to assess whether he has a gross instability or whether the pain is more muscular. (*Id.*).

A few daw later, Plaintiff saw Dr. Michael Mikhael of the Department of Diagnostic

Radiology and Nuclear Medicine. (Tr. 232). Dr. Mikhael performed an MRI of Plaintiff's lumbar

spine, the results of which indicated that Plaintiff's previous right hemilaminectomy at L4-L5

showed enhancement. (*Id.*). There was no evidence of a herniated or extruded disc or any bony

stenosis. (*Id.*). However, Dr. Mikhael did report that some minimal bulging of Plaintiff's disc was

seen at the L5-S1 level. (*Id.*). Ultimately, Dr. Mikhael found enhancing epidural fibrotic changes

in Plaintiff's right hemilaminectomy at L4-L5 with no evidence of a recurrent herniated disc or

significant foraminal narrowing. (*Id.*).

Six days later, Plaintiff saw Dr. Stadlan again. (Tr. 240). Dr. Stadlan reviewed Plaintiff's

MRI from July 23, 1999, and indicated that there appeared to be degenerative disc disease at L4-5.

(*Id.*). Additionally, Dr. Stadlan noted some very small minimal disc bulges but no impingement on any nerve root. (*Id.*). Dr. Stadlan also filled out a functional/activity work status form for Plaintiff. On the form, Dr. Stadlan indicated Plaintiff was cleared to carry up to 30-40 pounds occasionally. (Tr. 243). Ultimately, Dr. Stadlan recommended Plaintiff start physical therapy and prescribed Soma and Voltraren. (*Id.*).

Plaintiff saw physical therapist Jonathan Bender four days after seeing Dr. Stadlan. Mr. Bender evaluated Plaintiff and noted that Plaintiff's significant problems include: limited sitting tolerance due to lower back pain; slow and guarded functional movements; and coughing and sneezing which cause lower back pain. (Tr. 239). Mr. Bender's clinical assessment indicated Plaintiff had limited lumbosacral range of movement and a significantly weaker right lower extremity. (*Id.*). Mr. Bender proposed a treatment plan for Plaintiff that would hopefully decrease Plaintiff's pain by eighty percent.

After Mr. Bender's report, Plaintiff's medical records fast forward to March 27, 2001. (Tr. 186). On March 27, 2001, a mental health assessment was performed on Plaintiff by Ms. Kristsi Kitchen, B.A/MHP of the Janet Wattles Center in Rockford, Illinois. (*Id.*). Ms. Kitchen indicated that Plaintiff came to Janet Wattles complaining of crying spells, an inability to think clearly, racing thoughts, decreased appetite, and feeling as though he was losing control. (*Id.*). A mental status exam revealed Plaintiff's thoughts were intact and sequential and he was able to answer questions and correctly answer simple mathematical problems. (Tr. 187). Under her clinical summary, Ms. Kitchen reported Plaintiff had a GAF of 45. (Tr. 191).

Also on March 27, 2001, Plaintiff saw Dr. Uma Srivastava, a staff psychiatrist at Janet Wattles. (Tr. 184). Dr. Srivastava reported that Plaintiff looked "[r]ather shabbily dressed" and

quite depressed and sad. (*Id.*). However, Plaintiff was oriented to time, place and person with a clear sensorium. (*Id.*). Ultimately, Dr. Srivastava diagnosed Plaintiff as suffering from a major depression recurrent without psychotic features, a dependent personality, and a GAF of 60. (*Id.*).

On April 6, 2001, Plaintiff saw Dr. Carol Dubois, a staff psychiatrist at Janet Wattles. (Tr. 183). Dr. Dubois reported that Plaintiff had been on Prozac for a week prior to April 6, 2001 and the Prozac was working well. (*Id.*). Specificaly, Dr. Dubois reported Plaintiff felt forty percent better and smiled. (*Id.*). Dr. Dubois continued Plaintiff on the Prozac.

Another MRI of Plaintiff's back was done on September 13, 2001. (Tr. 218). Dr. Chad Justesen, of Rockford Memorial, requested an MRI of Plaintiff's back again because Plaintiff continued to complain of pain in his back. (*Id.*). The MRI revealed an apparent right hemilaminectomy at L4-5. (*Id.*). The disc was abnormal with loss of height and disc dessication. (*Id.*). Additionally, a rounded or ovoid structure lying behind the right side of Plaintiff's L5 vertebral body was noted. (*Id.*). Plaintiff saw Dr. Justesen on September 25, 2001 to discuss the MRI. (Tr. 220). Dr. Justesen recommend Plaintiff return to physical therapy for six weeks and possibly receive epidural steroid injections to alleviate the pain. (*Id.*). On October 12, 2001, Plaintiff received an epidural steroid injection. (Tr. 225).

On October 20, 2001, Dr. Kamlesh Ramchandani, on behalf of the Illinois Department of Rehabilitation Services Bureau of Disability Determination, saw Plaintiff for twenty minutes. (Tr. 202). Dr. Ramchandani indicated Plaintiff was having sharp back pain with numbness in his right leg. (*Id.*). Plaintiff did not however have a cane or any assistive device. (*Id.*). Dr. Ramchandani's physical exam revealed Plaintiff was alert, oriented times three and in no acute distress. (*Id.*). Plaintiff's gait was normal unassisted and he was able to walk on his heels and toes. (Tr. 203). Dr.

Ramchandani's impressions of Plaintiff were that he suffered from chronic backache secondary to discogenic disease of his lumbar spine and a history of depression, although not suicidal. (Tr. 203).

Plaintiff saw Dr. Frederick Gahl of Rockford Memorial for a second epidural. (Tr. 227). Dr. Gahl reported that Plaintiff's first epidural did not eliminate his back pain. (*Id.*). In fact, Dr. Gahl reported that Plaintiff continued to have constant pain in his right lateral hip and thigh, to his right lateral calf and ankle. (*Id.*). Additionally, Dr. Gahl indicated that he was concerned that the fragment in Plaintiff's back was causing problems that probably would not be remedied with epidurals. (*Id.*).

On October 30, 2001, Dr. John Peggau of Psychology Consultants, PC, performed a psychological evaluation of Plaintiff. (Tr. 210). Dr. Peggau reported Plaintiff was going through a divorce and was prescribed anti-depressant medication although he was not taking them as of October 30, 2001. (*Id.*). Plaintiff's physical appearance was neat, clean and very meticulously groomed. (*Id.*). Plaintiff spoke clearly. His motor activity, gait and posture were normal. (*Id.*). His mood was appropriate and not depressive. (*Id.*). Of interest, Dr. Peggau reported Plaintiff takes three showers per day because Plaintiff said he feels dirty. The rest of the day Plaintiff told Dr. Peggau he watches television and listens to the radio. (*Id.*). In summary, Dr. Peggau reported Plaintiff showed no signs of depression and looked very well nourished, rested and had good skin tone. (Tr. 212).

Plaintiff saw Dr. Gahl again on November 14, 2001. (Tr. 229). Things seemed to improve with Plaintiff on this date. Dr. Gahl reported Plaintiff was occasionally pain free and only in pain two to three hours a day, mostly at night. (*Id.*). Plaintiff was using a cane at this time due to the fact that he had fallen on two separate occasions. Dr. Gahl reported that while Plaintiff still had lateral

hip pain, Plaintiff's pain was no longer constant and Plaintiff was sleeping well. (*Id.*). Even with Plaintiff improvements, Dr. Gahl nonetheless gave Plaintiff a third epidural in the hope that it would alleviate his pain further. (*Id.*).

A Psychiatric Review Technique Form was filled out by Dr. E. Kuesten on November 14, 2001 based on Plaintiff's medical record. (Tr. 258). Dr. Kuesten indicated that Plaintiff suffered from affective disorders that were not severe. (*Id.*). Specifically, with regards to Plaintiff's functional limitation, Dr. Kuesten reported that Plaintiff was mildly limited with regards to his restrictions of activities of daily living and difficulties in maintaining concentration, persistence or pace. (Tr. 268). Dr. Kuesten found no limitation with regards to Plaintiff's difficulties in maintaining social functioning or episodes of decompensation. (*Id.*). Dr. D.G. Hudspeth adopted Dr. Kuesten's finding on April 17, 2002. (Tr. 258).

On December 20, 2001, an unnamed doctor filed out a Residual Functional Capacity Assessment Form. (Tr. 272). The unnamed doctor opined that Plaintiff can lift twenty pounds occasionally, ten pounds frequently, stand and/or sit for at least two hours in an eight hour workday, sit with normal breaks for a total of six hours in an eight hour workday, and push and/or pull an unlimited amount. (Tr. 273). The unnamed doctor also indicated that Plaintiff had no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations. (Tr. 275-277). Dr. William Conroy affirmed these findings on April 22, 2002. (Tr. 272).

On April 18, 2002, Ms. Ronee Kennedy, DCA II, filed out a Report of Contact. (Tr. 178). Ms. Kennedy reported that Plaintiff's RFC indicated Plaintiff is limited to only light work and must avoid work at unprotected heights and the operation of hazardous machinery and equipment. (*Id.*).

According to Ms. Kennedy, a person with such limitations could perform work as a furniture rental consultant, scaling machine operator, and cotton classifier. (*Id.*).

On April 22, 2002, Ms. Kennedy filed out a Residual Functional Capacity Assessment Form. (Tr. 288). Ms. Kennedy reported that Plaintiff's exertional limitations precluded lifting twenty pounds occasionally, ten pounds frequently, standing and/or walking about six hours in an eight hour day, siting about six hours in an eight hour workday and pushing and/or pulling an unlimited amount. (Tr. 289). With regards to Plaintiff's postural limitations, Ms. Kennedy reported Plaintiff is limited occasionally in his ability to climb, balance, stoop, kneel, crouch, and/or crawl and never limited in his ability to balance. (Tr. 290). No other limitations were noted.

Dr. Frank Bonelli of SwedishAmerican Hospital in Rockford, Illinois saw Plaintiff on July 19, 2002. (Tr. 314). Dr. Bonelli reported that a view of Plaintiff's lumbar indicated a moderate narrowing of Plaintiff's L4-5 interspace with relative preservation of the remaining intervertebral disk space heights. (*Id.*). Dr. Bonelli also indicated that the remainder of the exam revealed no abnormalities. (*Id.*).

Beth Reinhardt, BA/MHP of Janet Wattles saw Plaintiff on October 18, 2002. (Tr. 302). Ms. Reinhardt reported Plaintiff's assessment of Plaintiff was that he walked with a limp and used a cane and was unshaven. (Tr. 303). Plaintiff was oriented and able to answer questions when asked and reported a decreased appetite. (*Id.*). Ms. Reinhardt ultimately concluded Plaintiff's problems were that he suffered from a major depressive disorder, back problems and had a GAF of 45. (Tr. 304). Ms. Reinhardt recommended Plaintiff get a psychiatric medication assessment, individual counseling and take medication. (Tr. 306).

11

## IV.    **STANDARD OF REVIEW**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its judgment for that of the [ALJ]." *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997); *see also Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision rests with the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. §405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000); *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Pope v. Shalata*, 998 F.2d

473, 487 (7th Cir. 1993). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ's decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

## V.   FRAMEWORK FOR DECISION

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied his application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[4] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

---

[4]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[5] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467, 470-71 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if

---

[5]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not,

the claimant will be found to be disabled.

## VI.   ANALYSIS

The court will proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to his decision issued on December 26, 2002. (Tr. 15). Specifically, the ALJ stated "[t]here is no evidence of work after the alleged onset date in this case." (*Id.*).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the Analysis is affirmed.

B. Step Two:  Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found Plaintiff suffered from degenerative disease of the lumbar spine and depression. (*Id.*).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C. Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 26). The ALJ found, after thoroughly proceeding through the listings, that Plaintiff's conditions did not meet or equal listing section 1.00 or 12.04. (*Id.*). With regards to listing 12.04, the ALJ meticulously proceeded through the requirements to satisfy listing 12.04 and ultimately determined that some of Plaintiff's limitations were mild while the others were nonexistent. As a result, the ALJ determined Plaintiff did not satisfy listing 12.04 and this court agrees.

Substantial evidence exists to support the ALJ's finding and the court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

D. Step Four: Is the claimant capable of performing work which the claimant performed in the past?

Before proceeding to Step Four, the ALJ first needed to determine Plaintiff's residual functional capacity ("RFC"). In determining a mental RFC, the first step in the procedure is to assess the nature and extent of the claimant's mental limitations and restrictions (20 C.F.R. § 416.945 (c)). This information is then used to determine the mental RFC. In order to properly assess an individual's level of functioning due to a mental disorder, evaluation of the impairment must take into account the severity of the impairment over a period of time.(20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1 12.00 (d)). This information is then used to complete claimant's vocational assessment. After carefully considering the Plaintiff's entire medical record, including Plaintiff's allegations of disabling symptoms, the ALJ found Plaintiff's medically determinable impairments

17

precluded the following:

> lifting/carrying up to 10 pounds more than occasionally, 5 pounds more than frequently; standing and/or walking for more than a combined total of 2 hours in an 8 hour day and for longer than 15 minutes, continuously; sitting with normal breaks for more than 6 hours in an 8 hour day, but must be allowed to alternate between sitting and standing positions at intervals of 30 minutes for a period of 1 to 2 minutes on each such occasion; may not climb ladders, ropes or scaffolds, buy may otherwise climb ramps/stairs, balance, stoop, kneel, crouch, and crawl no more than occasionally; must avoid exposure to hazards such as exposed/unprotected heights or excavations and to exposed unprotected dangerous moving machinery; and, does not possess the capacity to recall, focus upon or carry out complex or detailed instructions, or to focus upon and perform complex/detailed tasks at a sustained workmanlike pace; but retains the capacity to focus upon and carry out simple instructions, and to perform simple routine tasks at a sustained workmanlike pace; and, may not perform work requiring more than incidental contact with members of the general public.

(*Id*). Based on the above limitations, the ALJ found that Plaintiff cannot perform any past relevant work, as testified to by the vocational expert, because even Plaintiff's least demanding job required him to perform work activities inconsistent with the RFC determined above. (Tr. 21). While Plaintiff's work history is not perfectly clear, the vocational expert found that two of Plaintiff's prior jobs were classified as semi-skilled and unskilled, light. (*Id*.). Based on these classifications, Plaintiff's limitations would preclude any past relevant work. This court agrees.

The finding of the ALJ as to Step Four of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step Four of the Analysis is affirmed.

E.      Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

At Step Five The ALJ determined that although Plaintiff's RFC did not allow him to perform the full range of light work, there existed a significant number of jobs in the national economy that he can perform. Before proceeding, the ALJ first noted that Plaintiff's past relevant work provided some skills, but those do not transfer to other occupations within Plaintiff's RFC. (Tr. 21). Based on Plaintiff's RFC, the ALJ determined Plaintiff can perform a limited range of sedentary work. As an aside, the ALJ noted that if Plaintiff could perform a full range of sedentary work, Medica-Vocational rule 201.28 would apply and a finding of "not disabled" would apply. (Tr. 22). However, because Plaintiff's RFC limitations do not "exactly coincide" with the rule, the ALJ ultimately determined the rule could not apply. (*Id.*).

Once the ALJ determined that Plaintiff did not fit within the vocational rules, the ALJ consulted a vocational expert. Based on the limitations previously noted, the vocational expert determined the following unskilled sedentary jobs in the region existed: Assembler (4,000 jobs); Packer (2,000 jobs); and Inspection (less than 1,000 jobs). (*Id.*). Additionally, although not necessarily needed, the ALJ noted that the use of a cane for ambulation would not decrease the number of stated jobs above. (*Id.*). Thus, the ALJ ultimately determined a substantial number of jobs exist that Plaintiff can perform. (*Id.*).

Plaintiff argues, *inter alia*, that the ALJ failed to properly consider the severity of the mental impairment by, among other things, failing to have a medical expert testify at Plaintiff's hearing, and that the ALJ substituted his judgment for that of the physician's. (Pl.'s Mem. of Law in Support of Pl.'s Mot. for Summ. J. at 6). This court rejects Plaintiff's argument as discussed below.

Generally, an ALJ is required to consult a medical expert if there is not an adequate basis in the record to determine whether the Plaintiff is disabled. *See Green v. Apfel*, 204 F.3d 780, 781 (7th

Cir. 2000); *see also* 20 C.F.R. § 416.927 (c)(3)(stating that "[i]f the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled, ... we will ... ask you or others more information.") The ALJ may not substitute his/her own judgment for a physician's opinion or play doctor. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

Plaintiff's argument appears to focus on Ms. Kitchen's and Ms. Reinhardt's GAF findings of 45 and Dr. Srivastava's GAF finding 60. According to Plaintiff, a GAF of 45 would completely preclude Plaintiff from work. Plaintiff argues this because a GAF scored between 41 and 50 indicates "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994)(outlining the GAF scale). A GAF between 51 and 60, on the other hand, indicates only "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." *Id.* Therefore, if Plaintiff's GAF is 45, then it would follow, according to Plaintiff, that Plaintiff has serious symptoms that preclude him from performing any of the jobs presented by the vocational expert.

Defendant argues that the GAF of 60 is more correct and that such a designation will not prevent Plaintiff from performing the jobs presented by the vocational expert. In so arguing, Defendant first attempts to discredit the two 45 GAF scores because they were rendered by unacceptable sources, namely nurse practitioners. *(See* tr. 186, 191-192, 302, 304). However, Defendant's attempt is improper because, as Plaintiff correctly argues, the determinations of nurse practitioners are considered acceptable sources. The statute states "[i]n addition to evidence from

20

the acceptable medical sources ... we *may* also use evidence from other sources to show the severity of your impairments" such as nurse practitioners. 20 C.F.R. § 404.1513(d)(1)(emphasis added). The use of the word "may" does not dictate that the ALJ rely on such sources but this court would find it inappropriate to completely ignore such sources. The ALJ did not ignore the nurse practitioners. Rather, the ALJ focused on the entire record. Remember the most qualified source, Dr. Srivastava, determined Plaintiff had a GAF of 60.

In addition to Dr. Srivastava's GAF score, the ALJ also relied on state agency medical and psychological consultants, none of which found Plaintiff disabled. Further, no treating physicians found Plaintiff disabled. The ALJ's reliance on state agency medical and psychological consultants is not misplaced. *See Scheck v. Barnhart*, No. 03-2107, 2004 WL 212907, at *2 (7th Cir. Feb. 5, 2004)(finding that an ALJ may properly rely upon the opinion of state agency physicians"); 20 C.F.R. § 416.928(f)(2)(i) ("State agency medical and psychological consultants ... are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.")

Turning to Plaintiff's back, it is also undisputed that Plaintiff responded well to epidural steroid injections, and at the second injection, Plaintiff reported to Dr. Justeen that he was occasionally pain free and feeling better. (Tr. 229). Additionally, Plaintiff reported that the injection almost eliminated his leg pain and instead of surgery, Dr. Justeen continued conservative treatment. (Tr. 284). Additionally, the record contains numerous findings that Plaintiff's muscle strength was good and that Plaintiff could walk unassisted with a normal gait, squat and rise without support and move with little difficulty. (Tr. 203). While Plaintiff has limited hip and lumbar motion, the ALJ properly restricted Plaintiff to sedentary work with no more than occasional postural movements. (Tr. 16). The medical record, the GAF score determined by Dr. Srivastava and the opinions of the

21

state agency doctors (and the lack of a finding by Plaintiff's treating physicians to the contrary) are consistent with the ALJ's findings. Substantial evidence exists to support the ALJ's finding and the court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Five of the Analysis is affirmed.

## VII.   CONCLUSION

For the above stated reasons, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Defendant's Motion for Summary Judgment is granted. Plaintiff's Motion for Summary Judgment on the administrative record and pleadings is denied.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 8/27/04